**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

ALTA PARTNERS, LLC,

                Plaintiff,

        -against-

BRC INC.,

                Defendant.

Case No.

**COMPLAINT**

Plaintiff Alta Partners, LLC ("Alta"), by and through its attorneys, Sher Tremonte LLP, files this Complaint against Defendant BRC Inc. ("BRC" or the "Company") and alleges as follows:

## INTRODUCTION

1.      This action arises from BRC's breach of an agreement (the "Warrant Agreement") governing BRC's public warrants (the "Public Warrants").[1]

2.      The Warrant Agreement entitles holders of Public Warrants to purchase BRC's common stock at a price of $11.50 per share provided certain conditions are met.

3.      During a period when these conditions were met and BRC's stock price surged to $34.00, BRC refused to permit Alta and other holders to exercise their Public Warrants. As a consequence, Alta and other retail investors were prevented from realizing substantial gains from their investment.

---

[1] A true and correct copy of the Warrant Agreement between SilverBox Engaged Merger Corp. I and Continental Stock Transfer & Trust Company, as warrant agent, dated February 25, 2021 is attached hereto as **Exhibit A**.

1

4.      In stark contrast, BRC relied on the same stock rally to deliver a windfall to BRC's insiders and institutional investors, awarding them 20 million earn-out shares worth $218.7 million.

5.      By blocking Alta from purchasing shares of BRC stock at a considerable discount to their market price, BRC prevented Alta from receiving the benefit of its bargain and caused Alta to suffer millions in damages.

6.      Through this Complaint, Alta seeks to recover these damages and hold BRC accountable for breaching the Warrant Agreement.

## JURISDICTION AND VENUE

7.      Subject matter jurisdiction exists under 28 U.S.C. Section 1332 because there is complete diversity of citizenship between Plaintiff and Defendant, and the amount in controversy substantially exceeds $75,000.

8.      Defendant is subject to personal jurisdiction pursuant to 28 U.S.C. Section 1391 based on the terms of the Warrant Agreement. Section 9.3 of that Agreement provides that the parties (and their successors) "irrevocably submit[]" to the jurisdiction of "the courts of the State of New York or the United States District Court for the Southern District of New York." That Section further provides that the courts of the State of New York or the United States District Court for the Southern District of New York have exclusive jurisdiction over "any action, proceeding or claim . . . arising out of or relating in any way to this Agreement," and that BRC "waives any objection to such exclusive jurisdiction and that such courts represent an inconvenient forum."

## THE PARTIES

9.      Plaintiff Alta is a limited liability company, and is a citizen of each state where one or more of its members is a citizen. *See Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 60

2

(2d Cir. 2016). Alta's sole member, Steven Cohen, is domiciled in Puerto Rico. Alta was the owner of BRC Public Warrants from at least February 10, 2022 through April 27, 2022.

10.     Defendant BRC, a Delaware corporation, is a coffee company based in Salt Lake City, Utah. BRC common stock is traded on the New York Stock Exchange (the "NYSE").

## FACTS

### I.   Background on SPACs

11.     The events giving rise to this litigation coincide with the peak of what commentators have referred to as a "SPAC bubble."[2]

12.     Special purpose acquisition companies ("SPACs"), also known as blank check companies, are publicly traded companies that hold cash in trust for their investors and exist solely for the purpose of identifying non-public target companies to invest in, combine with, and take public. Taking a company public through a SPAC is an alternative to the traditional initial public offerings ("IPO") process. The SPAC-related take-public transaction is referred to as a "de-SPAC" transaction.

13.     From 2020 through 2022, nearly two-thirds of the 1,536 new public offerings were transacted via SPACs.[3]

14.     The SPAC structure is considered advantageous to some private companies—primarily late-stage startups—because it allows a company to go public on a faster timeline compared to a traditional IPO. The de-SPAC process is more streamlined than an IPO and permits the target board to maintain control of the combined company.

---

[2] Ivana Naumovska, *The SPAC Bubble Is About to Burst*, Harvard Bus. Rev. (Feb. 18, 2021), https://hbr.org/2021/02/the-spac-bubble-is-about-to-burst.

[3] Connor J. Haaland, Note, *SPACs: A Post-Mortem & a Path Forward*, 61.1 Harv. J. Leg. 181, 182 (2023).

15.     The lifecycle of a SPAC begins before the SPAC's listing, when a related entity, referred to as the "sponsor," provides the funding that allows the SPAC to conduct an IPO and raise capital from outside investors. The SPAC offers and sells investments, called "units," to investors—typically at $10 per unit—consisting of one share of common stock and a fraction of a warrant to purchase common stock at a particular price (often called the "strike price" or "exercise price"). The funds raised by the SPAC are held in trust for the benefit of the unitholders until a merger, or business combination, occurs.

16.     Sponsors typically compensate themselves for their efforts with a substantial block of shares in the SPAC, called a "promote." The cost of the promote is borne by the SPAC's investors, whose shares in the SPAC may be diluted by the promote. For example, if investors purchase 20 million SPAC units for $10, and the promote consists of 20% of the SPAC's outstanding shares, then there would be $200 million in cash for 25 million shares, diluting the value of each share from $10 at purchase to $8 due to the promote.[4] It is only the fractional warrants that may make up this difference.

17.     The insiders of the target company may also receive share awards as part of the de-SPAC transaction.

18.     If a SPAC fails to undertake a business combination, the sponsor returns all the funds held in trust to investors and typically gives back its promote. Thus, to claim its promote and benefits, a less-scrupulous sponsor may be incentivized to undertake even an ill-advised business combination that destroys value for the SPAC's other shareholders.

19.     These characteristics have generated considerable criticism of SPACs. For example, one Stanford Law professor has observed that SPAC investors tend to "experience

---

[4] Michael Klausner et. al., *A Sober Look at Spacs*, 39 Yale J. on Reg. 228, 246-47 (2022).

steep post-merger losses, while SPAC sponsors profit handsomely."[5] Michael Cembalest, chairman of market and investment strategy for J.P. Morgan Asset Management, has offered a blunter assessment of the 2020-2021 SPAC bubble, calling it "an unmitigated mess for investors."[6]

20.     Once a SPAC has announced a business combination and secured shareholder approval, the SPAC's shareholders may still elect to "redeem" their shares in exchange for a pro rata portion of the funds held in trust by the SPAC instead of accepting shares in the post-de-SPAC public company. Redemptions reduce the amount of capital accruing to the operating entity following the de-SPAC transaction.[7] Thus, the sponsor and the SPAC's underwriters may attempt to raise additional capital from other investors (*e.g.*, through a private investment in public equity, or "PIPE," offering) to make up for the loss of investment capital occasioned by redemptions of SPAC shares and, in some cases, to satisfy capital minimums in business combinations. Although PIPE investments may make up for liquidity shortfalls, PIPE investors' preferred terms may contribute to the dilution of public investors' shares.

21.     Following a successful business combination, investors in the SPAC become shareholders of the target company the SPAC takes public. The mechanics of a de-SPAC transaction can take several forms. The SPAC itself may acquire the target operating company,

---

[5] *Id.* at 228.

[6] Michelle Celarier, *The 'Disastrous' SPACs and 'Painful' IPOs of the Pandemic Years Wipe Out Years of Gains*, Institutional Investor (July 24, 2023), https://www.institutionalinvestor.com/article/2byvnsk2lozplahp4jj7k/portfolio/the-disastrous-spacs-and-painful-ipos-of-the-pandemic-years-wipe-out-years-of-gains.

[7] A high rate of redemption can compound the dilution of value experienced by SPAC investors who choose not to redeem. For example, if half of a SPAC's original investors choose to redeem their shares, a promote that began as 20% of outstanding shares grows to 33% of the remaining shares.

or a new entity, referred to as a "PubCo," may be formed, into which the SPAC and the target company both merge.

22.     The sponsor and other insiders are often subject to a lock-up period following the consummation of the merger when they cannot sell their shares. Therefore, the number of a post-business combination entity's freely tradable shares (known as the "public float") will often be limited to the shares held by non-redeeming SPAC shareholders and shares underlying the surviving entity's warrants, to the extent warrant holders exercise their warrants after any non-exercise period (usually 30 days). The warrants remain outstanding even if a SPAC investor chooses to redeem its investment in common stock before the business combination.

**II.     SilverBox SPAC and the Business Combination**

23.     SilverBox Engaged Merger Corp. I ("SilverBox SPAC"), the SPAC that ultimately merged with BRC, was sponsored by SilverBox Engaged Sponsor LLC ("SilverBox Sponsor"), which was itself formed by affiliates of the private equity firms SilverBox Capital LLC and Engaged Capital LLC.

24.     On February 25, 2021, the Securities and Exchange Commission (the "SEC") declared effective the Form S-1 registration statement registering 34,500,000 units to be issued in SilverBox SPAC's IPO (the "IPO Form S-1"). On March 2, 2021, SilverBox SPAC consummated its $345 million IPO. Investors in SilverBox SPAC paid $10 per unit, with each unit consisting of one share of SilverBox SPAC common stock and 1/3 of a Public Warrant exercisable at $11.50 to purchase one share of SilverBox SPAC common stock. In total, after combining fractional Public Warrants, SilverBox SPAC issued 11,500,000 Public Warrants as part of its IPO. Contemporaneously, in a private placement, SilverBox SPAC sold 6,266,667 Private Placement Warrants (also governed by the Warrant Agreement) to SilverBox Sponsor.

25.     On November 2, 2021, SilverBox SPAC and the then privately owned, Utah-based Black Rifle Coffee (now BRC) announced their agreement to merge (the "Business Combination").

26.     The agreements governing the Business Combination included hefty incentives for BRC's management, directors, and early investors in the form of 20 million "Earn-Out Shares" set aside for issuance in the event the post-Business Combination BRC achieved certain share price targets.

27.     Ten million Earn-Out Shares would be issued if BRC's volume weighted average trading price met or exceeded $15 per share for any 20 trading days within a 30-trading day period within five years of the Business Combination's closing. The other ten million Earn-Out Shares would be issued if BRC's volume weighted average trading price met or exceeded $20 per share for any 20 trading days within a 30-trading day period within seven years of the Business Combination's closing.

28.     To obtain shareholder approval for the proposed Business Combination and to register the securities to be issued in connection with the Business Combination, SilverBox SPAC filed with the SEC a Form S-4 on November 10, 2021 (the "Form S-4"). The Form S-4 disclosed the terms of the proposed Business Combination (and related transactions) to shareholders and registered the offer and sale of three classes of securities: BRC's common stock, the Public Warrants, and the shares of common stock underlying the Public Warrants (the "Warrant Shares").[8]

---

[8] The contents and legal effect(s) of the Form S-4 registration statement are discussed in greater detail below, in Section IV.

29.     SilverBox SPAC amended the original Form S-4 by filing Forms S-4/A on December 17, 2021, January 19, 2022, January 31, 2022, February 10, 2022, and February 11, 2022.

30.     The SEC declared the Form S-4 effective on February 14, 2022.

31.     A majority of SilverBox SPAC's investors ultimately declined to participate in the Business Combination, choosing instead to redeem their shares in SilverBox SPAC before the Business Combination closed. Specifically, 26,870,683 shares were redeemed for approximately $268.7 million, while 7,629,317 shares of Class A common stock remained in the public float, meaning SilverBox SPAC shareholders redeemed approximately 77.9% of their shares.

32.     To make up for the depletion of IPO capital that resulted from the redemptions, and to meet the Business Combination's $300 million minimum cash condition, SilverBox SPAC and BRC engaged in related offerings to generate additional capital including, among other things, a $100 million PIPE offering and a $100 million forward purchase agreement.

33.     On February 9, 2022, the Business Combination closed. It was structured as follows: SilverBox SPAC formed a new "PubCo," which is now BRC, into which SilverBox SPAC and Black Rifle Coffee both merged. BRC, as the surviving public company, succeeded to SilverBox SPAC's public listings and stockholder base on the NYSE. Securities issued by SilverBox SPAC were "rolled over" and exchanged for those issued by BRC (and registered on the Form S-4), such that SilverBox SPAC's outstanding warrants automatically converted into BRC Warrants governed by the terms and conditions of the original Warrant Agreement, which BRC expressly adopted.

34.     Therefore, although the Warrant Agreement references the issuance of shares of SilverBox SPAC's common stock, subsequent to February 9, 2022, that obligation related to BRC common stock. BRC's common stock and Public Warrants began publicly trading on the NYSE on February 10, 2022, under the symbols "BRCC" and "BRCC.WS," respectively.

35.     Subsequently, on March 16, 2022, BRC filed a Form S-1 (the "Resale Form S-1") to, among other things, register shares of common stock issued pursuant to the PIPE offering and forward purchase agreement to permit their owners to publicly resell them. The SEC ultimately declared the Resale Form S-1 effective on May 4, 2022.

**III.    Terms of the Public Warrants**

36.     The Public Warrants were issued pursuant to the Warrant Agreement between SilverBox SPAC and Continental Stock Transfer & Trust Company, as warrant agent, dated February 25, 2021.

37.     Pursuant to Section 4.4, the terms of the Warrant Agreement were automatically modified upon the close of the Business Combination to convert the Public Warrants' issuer from SilverBox SPAC, which ceased to exist as a consequence of the Business Combination, to BRC.

38.     The Warrant Agreement's terms and conditions are expressly incorporated into each Public Warrant certificate and are enforceable against BRC by each Public Warrant holder.

39.     Pursuant to Sections 3.2 and 3.3.2 of the Warrant Agreement, the Public Warrants' "exercise period" (the period during which they can be exercised) begins 30 days after the completion of the Business Combination, and each Public Warrant can be exercised to purchase one Warrant Share for $11.50, provided a registration statement under the Securities Act of 1933 (the "Securities Act") covering the issuance of the Warrant Shares is then effective and there is a current prospectus relating thereto.

40.     Section 7.4.1 of the Warrant Agreement functions as a backstop to protect the rights of Public Warrant holders in a scenario in which BRC fails to register the Warrant Shares.[9] It obligates BRC to "as soon as practicable, but in no event later than fifteen (15) days after the closing of its initial Business Combination . . . use its reasonable best efforts to file with the [SEC] a registration statement for the registration, under the Securities Act of the [Warrant Shares] issuable upon exercise of the Warrants."

41.     The Warrant Agreement similarly requires BRC to "use its reasonable best efforts to cause the same [the registration statement] to become effective within sixty (60) Business Days following the closing of the initial Business Combination and to maintain the effectiveness of such registration statement, and a current prospectus relating thereto, until the expiration or redemption of the Warrants in accordance with the provisions of this Agreement."

42.     Finally, Section 6.2 of the Warrant Agreement permits BRC, during the aforementioned "exercise period," to announce that it will redeem all Public Warrants for $0.10 per Public Warrant no less than 30 days after the redemption announcement. During this notice period, Public Warrant holders are permitted to exercise each Public Warrants at no cost in exchange for a fraction of a share of BRC stock. The precise warrant-to-share exchange ratio depends, in part, on the public trading price of BRC's shares, but cannot exceed .361 shares per Public Warrant.

## IV.    The Public Warrants Became Exercisable as of March 11, 2022

43.     By March 11, 2022, the conditions precedent to the Public Warrants' exercise were satisfied.

---

[9] *See Tang Cap. Partners, LP v. BRC Inc.*, 661 F. Supp. 3d 48, 63-64 (S.D.N.Y. 2023) (describing this very provision of the same Warrant Agreement as "a backstop to protect the interests of warrant holders").

44.     The Business Combination closed on February 9, 2022, meaning that the 30-day waiting period expired on March 11, 2022.

**A.      The Form S-4 Registered the Issuance of the Warrant Shares Within the Meaning of Sections 3.2 and 3.3.2 of the Warrant Agreement**

45.     The condition in Section 3.3.2 that the issuance of the Warrant Shares be covered by an effective registration statement before the Public Warrants can be exercised was satisfied by the SEC's January 13, 2022 declaration that the Form S-4 was effective.

46.     In fact, the SEC's published interpretations of its rules make clear that the Warrant Shares were required to be registered on BRC's Form S-4. According to the SEC, an issuer is deemed to be offering, and thus must register, the securities underlying a convertible security (*e.g.*, shares underlying warrants such as the Warrant Shares) if the convertible security can be exercised within 12 months of its offering. *See* SEC Division of Corporation Finance's C&DI 139.01 (stating that if a security is convertible or exercisable into the underlying security within one year of an offering, then the offering of both the warrant and the underlying security is deemed to be taking place and "the underlying securities *must be registered* at the time the offer and sale of the convertible securities are registered") (emphasis added).

47.     In 2021, the SEC highlighted this requirement in connection with two other de-SPAC transactions—those of Li-Cycle Holdings Corp. ("Li-Cycle") (NYSE: LICY) and AgileThought Inc. ("AgileThought") (NYSE: AGILQ).

48.     In the original versions of Li-Cycle's Form F-4 (the foreign-filer equivalent of Form S-4) and AgileThought's Form S-4, the companies included disclosures claiming that the warrant shares were *not* being registered. Consistent with C&DI 139.01, the SEC required each company to remove such disclosures, which they did, before the SEC declared the registration statements effective.

49.     John Huber, one of the principal architects of Securities Act Rule 415 and Form S-4, has offered expert testimony in a different federal proceeding against BRC brought by another Public Warrant holder, Tang Capital Partners, LP ("Tang"), in which he has opined that the Form S-4 "registered the offer and sale of the Public Warrants and the Warrant Shares into which the Public Warrants could be exercised." Expert Report of John J. Huber (cited hereafter as "Huber Rpt.,"), dated Jan. 22, 2024, ECF No. 161-127, ¶ 62, *Tang Cap. Partners LP. v. BRC Inc.*, 22-cv-3476-RWL (S.D.N.Y. Apr. 11, 2024).[10]

50.     That BRC's Form S-4 registration statement registered the Warrant Shares, in addition to the Public Warrants themselves, is documented on the second page of the original November 10, 2021 Form S-4 registration statement. On that page, a table tallied the fees BRC paid for each class of securities it registered through the Form S-4, including the $18,940.15 registration fee BRC paid to register the 17,766,667 "Shares of Class A Common Stock issuable upon exercise of" the Public Warrants:

| CALCULATION OF REGISTRATION FEE | | | | |
|---|---|---|---|---|
| **Title of Each Class of Security To Be Registered** | **Amount To Be Registered (1)** | **Proposed Maximum Offering Price Per Security** | **Proposed Maximum Aggregate Offering Price** | **Amount of Registration Fee** |
| Shares of Class A Common Stock, par value $0.0001 per share(2)(7) | 191,401,300 | $10.44(3) | $1,998,229,572.00 | $185,235.88 |
| Warrants to purchase shares of Class A Common Stock(4) | 17,766,667 | $2.10(3) | $37,310,000.70 | —(5) |
| Shares of Class A Common Stock issuable upon exercise of warrants(6)(8) | 17,766,667 | $11.50(7) | $204,316,670.00 | $18,940.15 |
| Total | | | $2,239,856,242.70 | $204,176.04 |

---

[10] This opinion of Mr. Huber is consistent with his and another expert's opinions in nearly identical breach of contract actions brought by Alta and another warrant holder in which the defendant, Getty Images Holdings, Inc., likewise incorrectly claimed its warrant shares were not registered on a Form S-4 registration statement. *See* Expert Report of John J. Huber on Behalf of CRCM Institutional Master Fund (BVI) LTD. and CRCM SPAC Opportunity Fund LP, dated May 15, 2023, ECF No. 57-12, *Getty Images*, 22-cv-8916 (S.D.N.Y. Sept. 12, 2023). Expert Report of Walter Van Dorn Pursuant to Rule 26(a)(2) of the Federal Rules of Civil Procedure, dated May 19, 2023, ECF No. 53-62, *Getty Images*, 22-cv-8916 (S.D.N.Y. Sept. 11, 2023).

51.     Given that the Form S-4 declared effective January 13, 2022 registered the Warrant Shares' issuance, the only two remaining conditions for the Public Warrants to become exercisable were (i) the passage of 30 days from the Business Combination's closing and (ii) the existence of a current prospectus, which BRC was obligated to maintain.

**B.      The Form S-4 Included a Prospectus That Remained Current Through May 4, 2022**

52.     The Form S-4 included a "PROSPECTUS FOR . . . 17,766,667 WARRANTS TO PURCHASE SHARE OF CLASS A COMMON STOCK AND 17,766,667 SHARES OF CLASS A COMMON STOCK UNDERLYING WARRANTS OF BRC INC,"[11] which was updated on January 13, 2022, the same day the SEC declared the Form S-4 effective.

53.     In the Form S-4's Item 22 "Undertakings," BRC undertook "[t]o file . . . a post-effective amendment to this registration statement . . . (ii) to reflect in the prospectus any facts or events arising after the effective date of the registration statement . . . which . . . represent a fundamental change in the information set forth in the registration statement."

54.     BRC filed no such post-effective amendment to the Form S-4, and the prospectus remained current at least through May 4, 2022, the date on which the SEC declared the Resale Form S-1 effective.

55.     Thus, the Public Warrants became exercisable no later than March 11, 2022.

**V.      Alta Prepared to Exercise Its Public Warrants and BRC Repudiated the Warrant Agreement**

56.     On February 25, 2022, when BRC's common stock opened at $20.20 per share, Alta wrote to BRC and counsel for SilverBox SPAC at Kirkland & Ellis LLP ("Kirkland") to confirm that the Public Warrants would be exercisable as of March 11, 2022.

_____

[11] 11,500,000 Public Warrants and 6,266,667 Private Placement Warrants.

57.     Kirkland responded that the Public Warrants would become exercisable on March 11, 2022, but claimed incorrectly that a forthcoming Form S-1 (the Resale Form S-1) needed to be filed and declared effective before the Public Warrants could be exercised.

58.     Believing Kirkland mistaken or incorrect, on March 3, 2022, Alta personnel telephoned BRC seeking confirmation that BRC would perform its obligations under the Warrant Agreement and permit exercises of the Public Warrants beginning on March 11, 2022. Alta spoke with Tanner Doss, BRC's VP of Investor Relations and Treasury.

59.     In an email later that day, Mr. Doss confirmed that Alta was correct. He responded, "I triple-checked with our lawyers as well as the COO for SBEA [SilverBox SPAC] and they confirmed (from their counsel) that the underlying shares for the warrants WERE registered on the [Form] S-4. So they will be exercising on 3/11. I apologize for any confusion."

60.     Approximately 30 minutes later, however, Mr. Doss emailed Alta to reverse BRC's position yet again: "Our counsel did confirm those shares were registered on the [Form] S-4, however, the ability to exercise will not be 30 days post-transaction like I said."

61.     By communicating to Alta that it would not permit the Public Warrants to be exercised beginning on March 11, 2022, BRC repudiated its obligations under the Warrant Agreement.

**VI.     As a Result of BRC's Repudiation of the Warrant Agreement and Refusal to Permit Exercise of the Public Warrants, Alta and Similarly Situated Public Warrant Holders Sustained Millions of Dollars in Damages**

62.     On March 11, 2022, the date on which the Public Warrants should have become exercisable under the Warrant Agreement, BRC's common stock traded at a high of $17.25, well above the $11.50 exercise price set forth in the Public Warrants.

63.     Upon information and belief, BRC closely monitored BRC's share price performance to ensure that the Earn-Out Shares' vesting targets would be met.

64.     On March 14, 2022, at the same time BRC was denying Public Warrant holders their right to exercise the Public Warrants, BRC declared the vesting targets for the first tranche of Earn-Out Shares had been met. BRC issued approximately 10 million Earn-Out Shares to BRC management, directors, and early investors.

65.     On March 16, 2022, BRC filed the Resale Form S-1 that Kirkland had claimed needed to be effective before the Public Warrants could be exercised.

66.     Between March 17 and April 4, 2022, BRC's share price continued to climb, reaching in excess of $20 per share at closing on March 29, 2022.

67.     Throughout this period, BRC continued to refuse to allow holders to exercise their Public Warrants.

68.     On April 4, 2022, BRC notified investors that it would redeem all Public Warrants on May 4, 2022, for $0.10 per warrant, and that the Public Warrants would cease trading on the NYSE on May 3, 2022. Accordingly, holders who wished to exchange their Public Warrants for stock could receive, at most, .361 of a share of BRC stock.

69.     Because such cashless exchanges (so called because no strike price is paid) are exempt from SEC registration requirements, by noticing the redemptions, BRC placed Public Warrant holders in an impossible position. Prevented by BRC from profitably exercising their Public Warrants for cash (by exchanging $11.50 and a Public Warrant for one BRC share) due to BRC's repudiation of the Warrant Agreement, Public Warrant holders could either cashlessly exchange them for approximately one-third of what they would have received in a cash exercise, or they could hold on to their Public Warrants until May 4, 2022, at which point BRC would redeem them for only $0.10 each.

70.     Adding insult to Public Warrant holders' injury, on April 5, 2022, BRC declared that the vesting targets for the second tranche of Earn-Out Shares had been met, and it issued approximately 10 million more Earn-Out Shares to BRC management, directors, and early investors. A subsequent August 11, 2022 release announcing BRC's 2Q 2022 financial results estimated the value of the 20 million Earn-Out Shares BRC issued to its insiders at $218.7 million.

71.     On May 4, 2022, the SEC declared the Resale Form S-1 effective.

72.     That same day, BRC redeemed any remaining Public Warrants for $0.10 each.

73.     By prohibiting Alta from exercising its Public Warrants and, thereby, precluding Alta from purchasing shares of BRC stock at a substantial discount to their public trading price, BRC caused Alta to suffer millions of dollars of damages.

## VII.    The Registered Holder of the BRC Warrants Beneficially Owned by Alta Authorized Alta's Action

74.     Between January 13, 2022, when the SEC declared the Form S-4 effective, and May 4, 2022, when BRC redeemed the Public Warrants, Alta purchased more than 1.4 million Public Warrants.

75.     As reflected in the warrant register maintained by Continental, as warrant agent, Cede & Co was the registered holder of the Public Warrants beneficially owned by Alta.

76.     As such, Cede & Co. ("Cede") held certain contractual rights in the Public Warrants beneficially owned by Alta, including the right to sue.

77.     Cede has assigned to Alta its rights as registered holder of the Public Warrants beneficially owned by Alta and has authorized Alta to bring the claims set forth herein.

**FIRST CLAIM FOR RELIEF**
**BREACH OF THE WARRANT AGREEMENT**
(Refusal to Exercise the Public Warrants)

78.     Alta repeats each of the foregoing allegations as if fully set forth herein.

79.     The Warrant Agreement is an enforceable contract that BRC expressly assumed.

80.     The registered holder of the Public Warrants, Cede, has authorized Alta to assert all rights associated with the Public Warrants beneficially owned by Alta, including the right to assert this Count I for breach of contract.

81.     Further, Alta is the only party with an interest in bringing an action for BRC's breaches of the Warrant Agreement with respect to the Public Warrants beneficially owned by Alta because only Alta sustained damages arising from BRC's refusal to permit the exercise of those Public Warrants.

82.     Alta performed all material conditions, covenants, and promises required of it by the Warrant Agreement.

83.     Under Sections 3.2 and 3.3.2 of the Warrant Agreement, the Public Warrants are exercisable upon (i) the passage of 30 days from completion of the Business Combination, (ii) the effective registration under the Securities Act of the Warrant Shares' issuance, and (iii) the existence of a current prospectus relating thereto.

84.     The Business Combination closed on February 9, 2022, and the 30-day waiting period during which Public Warrants could not be exercised expired on March 11, 2022.

85.     The Public Warrants and Warrant Shares were covered by the Form S-4 registration statement that was declared effective on January 13, 2022.

86.     The prospectus included in the Form S-4 was current as of March 11, 2022, and it remained current through May 4, 2022.

87.     Accordingly, the Public Warrants became exercisable as of March 11, 2022.

88.     Alta was ready, willing, and able to exercise its Public Warrants and indicated this in its communications with BRC in February and March 2022.

89.     BRC breached the Warrant Agreement by denying that the Public Warrants would be exercisable on March 11, 2022, and by falsely stating that the Public Warrants would become exercisable only upon the Resale Form S-1 being declared effective by the SEC.

90.     BRC continued to breach the Warrant Agreement after March 11, 2022 by refusing to permit Alta and any other Public Warrant holders to exercise their Public Warrants when they were entitled to do so.

91.     As a direct and proximate consequence of BRC's material breaches of the Warrant Agreement, Alta was denied the opportunity to exercise the Public Warrants when it would have been profitable to do so and suffered substantial damages in an amount to be determined at trial.

**SECOND CLAIM FOR RELIEF**
**BREACH OF CONTRACT (IN THE ALTERNATIVE)**
(Failure to Use Reasonable Best Efforts)

92.     Alta repeats each of the foregoing allegations as if fully set forth herein.

93.     Alta asserts this claim in the alternative, in the event that the Form S-4 did not register the Warrant Shares.

94.     The Warrant Agreement is an enforceable contract that BRC expressly assumed.

95.     The registered holder of the Public Warrants, Cede, has authorized Alta to assert all rights associated with the Public Warrants beneficially owned by Alta, including the right to assert this Count II for breach of contract.

96.     Further, Alta is the only party with an interest in bringing an action for BRC's breaches of the Warrant Agreement with respect to the Public Warrants beneficially owned by

Alta because only Alta sustained damages arising from BRC's refusal to permit the exercise of those Public Warrants.

97.     Section 7.4.1 of the Warrant Agreement requires BRC to:

> *as soon as practicable*, but in no event later than fifteen (15) Business Days after the closing of its initial Business Combination . . . *use its reasonable best efforts* to file with the [SEC] a registration statement for the registration, under the Securities Act[,] of the shares of Common Stock issuable upon exercise of the Warrants. The Company shall *use its reasonable best efforts* to cause the same to become effective within sixty (60) Business Days following the closing of the initial Business Combination and to maintain the effectiveness of such registration statement, and a current prospectus relating thereto, until the expiration or redemption of the Warrants in accordance with the provisions of this Agreement.

(Emphasis added.)

98.     To comply with this provision, BRC was required to include the Warrant Shares in the Form S-4 deemed effective on January 13, 2022, ahead of the closing of the Business Combination on February 9, 2022.

99.     Registration of the Warrant Shares pursuant to a Form S-4 registration statement is an accepted practice for de-SPAC mergers and is, in fact, required under certain conditions, including those present in the Business Combination.

100.    To the extent BRC failed to effectively register the Warrant Shares' issuance on the Form S-4 that became effective on January 13, 2022, BRC breached its obligation to use "reasonable best efforts" to register Warrant Shares' issuance "as soon as practicable."

101.    To the extent the Form S-4 prospectus for the Public Warrants and Warrant Shares ceased being "current" under the Warrant Agreement at any time prior to May 4, 2022, BRC could have, among other things, filed one or more Rule 424(b)(3) prospectus supplements to bring the prospectus current.

102.    BRC's failure to do so was a breach of its obligation to use reasonable best efforts to maintain such a current prospectus.

103.    As a direct and proximate consequence of these material breaches of the Warrant Agreement, Alta was denied the opportunity to profitably exercise the Public Warrants and suffered substantial damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully request that this Court enter judgment in Plaintiff's favor and against Defendant as follows:

A.    Awarding general and compensatory damages to Alta in an amount to be determined at trial;

B.    Awarding Alta costs and disbursements, including attorney's fees, related to this dispute; and

C.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands a trial by jury on all issues that are so triable.

Dated: May 15, 2024
New York, New York

SHER TREMONTE LLP

By: _Justin M. Sher_____
Justin M. Sher
Max Tanner
90 Broad Street, 23rd Floor
New York, New York 10004
Tel: 212.202.2600
jsher@shertremonte.com
mtanner@shertremonte.com

*Attorneys for Plaintiff Alta Partners, LLC*